IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 15, 2008

Charles R. Fulbruge III
Clerk

No. 07-20906

TREVOR BRIGHT

Plaintiff - Appellant

V.

G B BIOSCIENCE INC

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas, Houston
No. 4:06-CV-1622

Before KING, HIGGINBOTHAM, and WIENER, Circuit Judges.

PER CURIAM:[*]

Plaintiff-appellant Trevor Bright appeals the district court's grant of GB Biosciences's motion for summary judgment on Bright's 42 U.S.C. § 1981 racial discrimination claim. Bright claims that GB Biosciences acted with discriminatory motivation when it did not hire him for permanent employment. Because Bright has failed to raise a genuine issue of material fact permitting an inference of discrimination, we affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I. Background

A. Factual Background

GB Biosciences manufactures crop protection products. Bright, who is African American, began working at GB Biosciences as a temporary contract worker in March 2003. At that time, Bryce Danna, one of GB Biosciences's superintendents, selected Bright and four others for temporary positions.

Bright started at GB Biosciences on the A Shift, where Craig Murphy supervised and trained him.[1] In June 2003, Murphy noted that Bright was having attendance and performance problems. Murphy conveyed his concerns to Danna. After Danna discussed these problems with Bright, Bright requested a transfer, claiming that Murphy was not properly training him. Danna granted Bright's request, and Bright was transferred to the C Shift, where Gene Evans supervised him. Evans also noted Bright's attendance problems. Bright's co-worker on the C Shift, Joe Nelson, however, believed that Bright was a good worker without any problems.

In June 2004, Bright unsuccessfully applied for a permanent operator position with GB Biosciences. Dixie Mullis, GB Biosciences's human resources manager, invited all five temporary workers to submit applications for the open position, in addition to seeking outside applicants. An interview panel consisting of Mullis, Danna, C Shift's head operator Pat Edwards, shift facilitator Lonnis Hawkins, and chief operator Wade Willis interviewed Bright for the position. Using a "targeted selection" process, the panel ranked Bright last out of the five

---

[1] Throughout Bright's brief to this court, his counsel confuses Craig Murphy, Bright's supervisor, with Richard Murphy, one of the temporary workers with whom Bright worked.

2

in-house applicants (making him fifth out of the seven applicants overall). GB Biosciences hired the highest-rated applicant.

GB Biosciences laid Bright off from his temporary position in July 2004, without complaint from Bright. Afterward, Bright continued to pursue permanent operator positions at GB Biosciences when they became available. Two such positions opened up in spring 2005, and GB Biosciences accepted applications for those positions from April 14 to May 9, 2005 (the "April–May period"). Willis notified Bright of the openings, and Bright confirmed them with Nelson. A factual dispute exists as to whether Bright submitted an application during this time frame. In deposition testimony, Bright asserted that he submitted three resumes "from March to about June, July." Although he lacked recollection of specific days or months, or with whom he spoke, he testified that he left the resumes at the receptionist's desk for the human resources department. In an affidavit in response to GB Biosciences's motion for summary judgment, he attested that he submitted applications in April and July 2005. Mullis, however, affirmed that she did not receive a resume from Bright during the period from April 14 to May 9. Whether or not Bright submitted his resume, his application was not considered, and he was not interviewed for the available positions. GB Biosciences interviewed four applicants, one of whom was African American, and hired two Caucasian applicants to fill the positions.

In June and July 2005 (the "June–July period"), GB Biosciences accepted applications for three additional experienced operator positions. Bright submitted, and GB Biosciences considered, his resume for these positions. Dave Lewis, the new CTL complex superintendent, and Mullis screened over 200 applications. Noting that Bright had previously worked at GB Biosciences as a contract worker, Lewis consulted with Danna about Bright's performance.

3

Danna told Lewis that he should not hire Bright, based on Danna's observations and information Murphy and Evans provided to him. Because of this negative feedback and Bright's relative lack of operator experience, Lewis marked "no interest" on Bright's resume.[2] At the time, Lewis was not aware of Bright's race. After screening resumes, Lewis and Mullis selected ten applicants for interviews, which were conducted on August 11 and 15, 2005. Two of the selected applicants were African American. From the ten selected interviewees, one African American applicant, one Caucasian applicant, and one Hispanic applicant were hired.

According to Bright, Willis then told Bright that "you might need to call the EEOC and have them do an investigation out here on their hiring practices." Willis did not indicate to Bright why he should do so, and, during his deposition, Bright could not recall if Willis mentioned race. Although some employees supported Bright's application and decried rumors about his poor performance, none of the deposed witnesses suggested that race was a factor in Bright's negative evaluations or GB Biosciences's decision not to hire him.

B. Procedural History

After an EEOC investigation, Bright filed the present complaint on May 12, 2006. He claimed racial discrimination giving rise to liability under § 1981 for two of GB Biosciences's employment decisions: (1) its decision not to hire him during the April–May period and (2) its decision not to hire him during the

---

[2] During the resume screening process, Mullis also received negative feedback on Bright. When later questioned by the Equal Opportunity Employment Commission (the "EEOC") after Bright filed an administrative complaint, Mullis attributed this negative feedback to Edwards, who oversaw C Shift's operations but had no supervisory authority over employees. During her deposition testimony, however, Mullis corrected that it came from either operations manager Steve Hamm or Danna.

June–July period. On June 22, 2007, GB Biosciences moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. GB Biosciences asserted that Bright failed to make a prima facie case of discrimination and failed to rebut its nondiscriminatory reasons for not hiring Bright. Bright opposed the motion.

The magistrate judge recommended granting summary judgment to GB Biosciences, and the district court adopted the magistrate judge's memorandum and recommendation (the "order") on December 4, 2007. In the order, the district court analyzed the case under the burden-shifting paradigm established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and the evidentiary burdens clarified in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000). The district court held that Bright had made a prima facie case. It granted summary judgment, however, because Bright failed to show that GB Biosciences's proffered nondiscriminatory reasons for not hiring Bright were pretexts for unlawful discrimination. Analyzing the strength of Bright's prima facie case, the probative value of the proof that GB Biosciences's explanations were false, and other evidence that GB Biosciences did not discriminate in its hiring decisions, the district court held:

> Unfortunately for Bright, his prima facie case is rudimentary at best, tipping only the weaker end of the scale. The most he has shown is that he applied for several operator openings, that he was rejected despite his basic qualifications, and that [GB Biosciences] continued to consider other applicants after he was rejected. These minimal facts generate the barest of discriminatory inferences. Bright has offered no other facts to buttress the inference that discriminatory bias played a role in his non-selection. An African-American was in fact hired for one of the positions sought. No pattern of racial discrimination in hiring was shown, statistically significant or otherwise. No evidence of racially-biased comments

5

> or favoritism on the part of [GB Biosciences] management was shown. Nor was there a history of similar discrimination complaints, charges, or lawsuits against the employer.

On top of the rudimentary prima facie case, the district court concluded that Bright's rebuttal of GB Biosciences's nondiscriminatory reasons had low probative value. It found that Bright's "extremely vague testimony about dropping off a resume did not directly contradict Mullis's clear testimony that she did not receive the application" during the April–May period and that, in any event, Bright failed to demonstrate a fact issue with regard to GB Biosciences's other articulated reason for his rejection—his history of performance and attendance problems and relative lack of experience. For the June–July period, the district court held that Lewis, the decision maker, "relied on competent information regarding Bright's experience and performance, and not his race, in making his decision." Other evidence, according to the district court, likewise refuted any inference of discrimination. GB Biosciences received over 200 applications during the June–July period; interviewed ten individuals, including two African Americans; and hired three new operators, including one African American. Bright was ranked last of the in-house contract workers during the 2004 hiring process, and "there is no evidence that Bright was more qualified, much less 'clearly more qualified,' for the positions than the individuals hired by [GB Biosciences] for the operator positions in 2005." Overall, the district court held that "considering the record evidence as instructed by Reeves, [GB Biosciences] is entitled to summary judgment because a reasonable factfinder could not infer from this evidence that [GB Biosciences]'s proffered motivation is not its true one and that [GB Biosciences] discriminated against Bright because of his race."

6

Bright timely appealed.  We have jurisdiction under 28 U.S.C. § 1291.

## II.  DISCUSSION

We review the district court's order granting summary judgment de novo, applying the same standard that the district court employed.  Cardinal Towing & Auto Repair, Inc. v. City of Bedford, 180 F.3d 686, 690 (5th Cir. 1999); Norman v. Apache Corp., 19 F.3d 1017, 1021 (5th Cir. 1994).  "We may affirm a summary judgment on any ground supported by the record, even if it is different from that relied on by the district court."  Holtzclaw v. DSC Commc'ns Corp., 255 F.3d 254, 258 (5th Cir. 2001).

Under de novo review, we view all the evidence in the light most favorable to and draw all inferences in favor of the nonmovant.  Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275, 282 (5th Cir. 2001); Crawford v. Formosa Plastics Corp., 234 F.3d 899, 902 (5th Cir. 2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  Crawford, 234 F.3d at 902 (quoting Anderson, 477 U.S. at 248).

A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence.  Absent direct evidence of discriminatory intent, as is the case here, we examine circumstantial evidence using the burden-shifting

framework set forth in the seminal case of McDonnell Douglas, 411 U.S. at 802.[3] Under this framework, a plaintiff first creates a presumption of intentional discrimination by establishing a prima facie case. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). The burden then shifts to the employer to articulate one or more legitimate, nondiscriminatory reasons for rejecting the applicant. McDonnell Douglas, 411 U.S. at 802; Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000). If the employer meets that burden, the prima facie case dissolves and the employee must demonstrate either that "a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

An employee alleging racial discrimination against his employer based on circumstantial evidence must first establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802; Russell, 235 F.3d at 222. The general prima facie requirement is that "[t]he plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." Burdine, 450 U.S. at 253–54. In this case, Bright must show: (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which GB Biosciences was seeking applicants; (iii) that he was not hired; and (iv) that GB Biosciences rejected him under circumstances

---

[3] Bright asserts his claim under § 1981. Although McDonnell Douglas was a Title VII case, we evaluate claims of race discrimination under § 1981 using the same analysis as those under Title VII. See Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989), superceded by statute on other grounds as stated in CBOCS West, Inc. v. Humphries, 128 S. Ct. 1951, 1957–58 (2008); Pratt v. City of Houston, 247 F.3d 601, 606 n.1 (5th Cir. 2001).

giving rise to an inference of unlawful discrimination.[4]  See McDonnell Douglas, 411 U.S. at 802.  Establishing a prima facie case raises a mandatory inference of discrimination.  St. Mary's Honor Ctr., 509 U.S. at 509–10 & n.3; Burdine, 450 U.S. at 254 & n.7, 256 n. 10; Russell, 235 F.3d at 222.  Overall, the burden of establishing a prima facie case is not onerous.  See Burdine, 450 U.S. at 253.

If Bright establishes a prima facie case, the burden shifts to GB Biosciences to produce one or more nondiscriminatory reasons for its decisions not to hire Bright.  The burden on the employer "is one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves, 530 U.S. at 142 (quoting St. Mary's Honor Ctr., 509 U.S. at 509).  To meet this burden, the employer must show, through admissible evidence, a legally sufficient reason for not hiring the plaintiff.  Burdine, 450 U.S. at 255.  When "the employer carries its burden, the 'mandatory inference of discrimination' created by the plaintiff's prima facie case 'drops out of the picture' and the fact finder must 'decide the ultimate question: whether [the] plaintiff has proven [intentional discrimination].'"  Russell, 235 F.3d at 222 (internal citations omitted,

---

[4] This standard is not inflexible, and the Supreme Court permits the plaintiff to establish an inference of discrimination under the fourth prong based on evidentiary requirements calibrated to the circumstances in each case.  Burdine, 450 U.S. at 254 n.6; McDonnell Douglas, 411 U.S. at 802 n.13.  In failure-to-hire cases, courts generally permit an inference where an applicant from a nonprotected class was hired or the employer continued to seek applicants after rejecting a qualified applicant from a protected class.  See Burdine, 450 U.S. at 254 n.6 (inferring discrimination when "after [complainant's] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications"); McDonnell Douglas, 411 U.S. at 802 (same); Blow v. City of San Antonio, 236 F.3d 293, 296 (5th Cir. 2001) (inferring discrimination where position was filled by someone outside the protected class); Risher v. Aldridge, 889 F.2d 592, 596 n.11 (5th Cir. 1989) (inferring discrimination where employer hired a nonminority for the job or continued to seek nonminority applicants for the position); Page v. U.S. Indus., Inc., 726 F.2d 1038, 1055 (5th Cir. 1984) (same).

alterations in original) (quoting St. Mary's Honor Ctr., 509 U.S. at 511–12; Burdine, 450 U.S. at 256 n. 10).

Thus, the ultimate burden remains with the plaintiff who may meet the burden by providing evidence that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence.  Reeves, 530 U.S. at 143; Burdine, 450 U.S. at 256.  If the plaintiff chooses the latter route, he must raise a genuine issue of material fact to "rebut each nondiscriminatory reason articulated by the employer." Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003).  Thus, as part of this analysis, the trier of fact may continue to consider the evidence establishing plaintiff's prima facie case and properly drawn inferences therefrom to reach the "issue of whether the defendant's explanation is pretextual."  Burdine, 450 U.S. at 255 n.10; see also Reeves, 530 U.S. at 148 (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated").  While the ultimate burden of proving discrimination remains with the plaintiff throughout the case, within the context of a summary judgment motion, "the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 813 (5th Cir. 1991).

A.    The April–May Hiring Decision

For the April–May period, we assume without deciding that Bright has established a prima facie case and hold that he has failed to rebut GB Biosciences's nondiscriminatory reason for its decision not to hire Bright.  GB Biosciences asserts that Bright failed to apply for the operator positions (a

requirement of the second prong of the prima facie test), failed to present evidence giving rise to an inference of unlawful discrimination (the fourth prong of the prima facie test), and failed to rebut its nondiscriminatory reason for not hiring him. We further assume without deciding that Bright has raised a genuine issue of material fact regarding whether he applied during the relevant April–May period and thus whether he satisfied the second prong for that period.[5] We also conclude that because GB Biosciences hired two Caucasian applicants during that period, Bright has shown facts permitting an inference of discrimination. We therefore assume without deciding that Bright has established a prima facie case for the April–May period. We agree with the district court, however, that Bright's "prima facie case is rudimentary at best," and "generate[s] the barest of discriminatory inferences."

Within the context of a weak prima facie case, Bright has failed to raise a genuine issue of material fact probative of pretext. GB Biosciences proffers that it did not hire Bright because of his failure to provide a resume during the period of acceptance between April 14 and May 9, 2005. Thus, the burden shifts to Bright to show that discrimination was more likely GB Biosciences's motivation or that this reason is a pretext for discrimination. To meet this burden, Bright argues only that GB Biosciences received and rejected Bright's

---

[5] The only requirement identified by GB Biosciences for the application process was submitting an application within the April 14 to May 9 window. Bright's deposition testimony was equivocal, showing only that he submitted three resumes from March to July. In his affidavit, he clarified that he submitted applications in both April and July. The first half of April was, however, outside of the April–May period. Even if Bright has raised a genuine issue as to whether he submitted an application during the relevant period, we view GB Biosciences's proffer that Mullis never received the application as a nondiscriminatory reason for not hiring Bright and analyze it that context. Cf. Blow, 236 F.3d at 297 n.1 (treating untimeliness of application as nondiscriminatory reason rather than element of prima facie case based on plaintiff's framing of the case).

resume during the April–May period. We hold that Bright has failed to raise a genuine issue of fact regarding pretext. GB Biosciences provided evidence that it did not hire Bright because Mullis did not receive his application. Bright's vague testimony that he submitted three resumes to someone at GB Biosciences from March to July and slightly more specific affidavit stating that he submitted a resume to someone at GB Biosciences in April do not directly controvert Mullis's testimony that she did not receive a resume from Bright during the relevant April 14 to May 9 period. Not only was the first half of April outside of the April–May period, but even if he applied during the second half of April, his affidavit and other evidence have not shown that Mullis, who screened the resumes during this period, ever received it, let alone rejected it. At best, he has shown that he handed his resume to someone in the human resources department other than Mullis during the relevant timeframe. As the district court concluded, "[w]hile Bright's affidavit may suggest the possibility of clerical error in handling or misplacing his paperwork, it certainly does not justify the inference that his application was deliberately discarded or ignored for reasons of his race." This evidence simply does not create a genuine issue of material fact that GB Biosciences's nondiscriminatory reason was pretext or that discrimination was more likely the reason for his rejection. See Burdine, 450 U.S. at 255–56 (concluding that at the pretext stage, "the factual inquiry proceeds to a new level of specificity"). Thus, GB Biosciences is entitled to summary judgment on Bright's claims related to the April–May period.[6]

---

[6] We do not decide whether GB Biosciences's other nondiscriminatory reasons—his performance and attendance problems as a temporary employee and his placement as fifth in the previous round of interviewing—provide an alternative basis for our ruling regarding the April–May period.

B.    The June–July Hiring Decision

For the June–July period, we hold that Bright has failed to establish a prima facie case and has failed to rebut GB Biosciences's nondiscriminatory reasons for not hiring him.  GB Biosciences asserts the Bright failed to present evidence giving rise to an inference of unlawful discrimination (the fourth prong of the prima facie test), and that Bright failed to rebut its nondiscriminatory reason for not hiring him.  Regarding the prima facie case, GB Biosciences hired an African American applicant.  Moreover, despite the district court's ruling to the contrary, GB Biosciences did not continue to seek applicants for the open operators positions after Bright was rejected—his rejection during the June–July period was part of a single hiring process that resulted in the positions being filled.   These circumstances do not give rise to any viable inference of discrimination of the sort considered in McDonnell Douglas and Burdine where temporal delays permitted such an inference.  See Burdine, 450 U.S. at 254 n.6 (drawing an inference of discrimination where employer continued to search for several months after receiving application from protected applicant); McDonnell Douglas, 411 U.S. at 802 (permitting an inference of discrimination where employer "sought mechanics, respondent's trade, and continued to do so after respondent's rejection").  Bright points to no other record facts on which to base an inference of discrimination[7] and has not argued that GB Biosciences engaged in a pattern of racial discrimination in hiring, that GB Biosciences has a history of discriminatory complaints against it, or that the relevant decisionmakers expressed racially biased comments or engaged in racially biased favoritism.  We

---

[7] Assertions in Bright's appellate brief that Bright's coworkers believed that GB Biosciences's decision was based on racial motivation are without factual citation, without support in the record, and wholly frivolous.

therefore hold that Bright has failed to establish a prima facie case for the June–July period. Nothing that Bright has shown for this period requires the court to put GB Biosciences to the burden of justifying its decisions or face entry of judgment against it. We thus affirm the district court's order for the June–July period on this alternative ground.

Even assuming that Bright has established a prima facie case for the June–July period, he has nonetheless failed to rebut GB Biosciences's nondiscriminatory reasons for not hiring him. GB Biosciences proffers a number of nondiscriminatory reasons for not hiring Bright, including his lack of qualifications sought by Lewis, his performance and attendance problems as a temporary employee, and his placement as fifth in the previous round of interviewing. GB Biosciences argues that Bright lacked qualifications sought by Lewis. Lewis stated in his affidavit that he did not select Bright for an interview because Bright "did not have the level of experience I was seeking for the position. He did not have the significant long term experience working for other chemical process companies like the candidates that I did approve for further interview." At the time, Lewis was unaware of Bright's race. Bright presents no evidence to refute this reason for GB Biosciences's rejection of his application. Bright's inability to raise a genuine issue of material fact showing that this reason was pretext entitles GB Biosciences to summary judgment on his claim related to the June–July period.

GB Biosciences also submits that it did not hire Bright based on his performance and attendance problems known to Danna and on his fifth-place ranking in the 2004 round of interviews. Uncontroverted evidence shows that Danna received negative feedback about Bright from Bright's direct supervisors at GB Biosciences—Evans and Murphy. Although Bright challenges the veracity

of Danna's, Evans's, and Murphy's reports and documents a few supporters who vouch for his performance, he provides the court with no relevant record facts on which to base a contrary conclusion and no legal authority to suggest Lewis and Mullis were not entitled to rely on Danna's statements in their decisionmaking process, whether or not Danna's perception of Bright's performance was accurate. Furthermore, Bright does not dispute that he ranked fifth out of the five in-house applicants in the 2004 interview process. These nondiscriminatory reasons thus provide alternative bases on which to grant GB Biosciences summary judgment on Bright's claim arising from the June–July period. Bright provides the court with no other evidence from which to draw a contrary conclusion.[8]

---

[8] Nor does Bright contest the qualifications of the selected applicants. Bright argues that the district court erred by applying an incorrect legal standard when finding that he was not "clearly more qualified" than the selected applicants. This court has long held that a showing that the unsuccessful applicant was "clearly better qualified" than the selected applicant meets the plaintiff's burden to prove that the employer's proffered reasons for not hiring him are pretexts. See Manning v. Chevron Chem. Co., 332 F.3d 874, 882 (5th Cir. 2003); Price v. Fed. Express Corp., 283 F.3d 715, 723 (5th Cir. 2002); Odom v. Frank, 3 F.3d 839, 845–46 (5th Cir. 1993). In Manning, the court rejected the plaintiff's argument, echoed here by Bright, that Reeves precludes the application of the clearly better qualified test. See Manning, 332 F.3d at 882 n.4 (concluding that "[plaintiff] fails to explain (and we fail to see) how the Court's decision in Reeves undermines our cases articulating the 'clearly more qualified' standard").

Nor, as Bright also asserts, is the standard no standard at all. Acknowledging that courts are not well positioned to compare applicants' qualifications, this court has stated, when discussing the clearly better qualified standard, that "unless disparities in curricula vitae are so apparent as virtually to jump off the page and slap us in the face, we judges should be reluctant to substitute our views for those of the individuals charged with the evaluation duty by virtue of their own years of experience and expertise in the field in question." Deines v. Tex. Dep't of Protective & Regulatory Servs., 164 F.3d 277, 280 (5th Cir. 1999) (emphasis in original). While the Supreme Court has rejected the "jumping off the page" test as "unhelpful and imprecise," see Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006) (per curiam), this court has clarified that "the phrase should be understood to mean that disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question,"

Overall, Bright has wholly failed to present a single piece of evidence that creates a genuine issue of material fact permitting an inference of racial discrimination in GB Biosciences's rejection of his applications. We therefore affirm the district court's order granting summary judgment.[9]

## III. Conclusion

For the reasons stated above, we AFFIRM the district court's order granting summary judgment in favor of the GB Biosciences. Costs shall be borne by appellant.

---

Deines, 164 F.3d at 280–81. The Court in Ash approved of this latter formulation of the standard, see 546 U.S. at 457, and nothing in the district court's order here suggests a nonconforming understanding or application. The district court's reliance on the clearly more qualified standard when discussing an alternative way that Bright could have (but had not) shown pretext was not erroneous.

[9] Bright claims that the district court improperly granted summary judgment on a ground not requested by GB Biosciences. Generally, "a district court may not grant summary judgment sua sponte on grounds not requested by the moving party." John Deere Co. v. Am. Nat'l Bank, 809 F.2d 1190, 1192 (5th Cir. 1987). The factual predicate of Bright's claim is difficult to discern. As discussed above, GB Biosciences moved for summary judgment on the grounds that Bright failed to establish a prima facie case of racial discrimination and that Bright failed to rebut GB Biosciences's nondiscriminatory reasons for not hiring him. The district court based its decision on Bright's failure to rebut GB Biosciences's nondiscriminatory reasons; therefore, Bright's contention is without merit.